# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**NANCY McGHEE and**
**H. WAYNE McGHEE,**

        Plaintiffs,

    -vs-                                          Case No. 13-C-958

**WEINERMAN & ASSOCIATES,**

        Defendant.

---

## DECISION AND ORDER

This is an action under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*, and the Wisconsin Consumer Act ("WCA"), Wis. Stat. §§ 421-427, concerning credit card debt incurred in the 1970's by Nancy Morgan (now McGhee) and her former husband Daniel. The defendant, Weinerman & Associates, LLC ("W&A"), is a "Minnesota-registered, Burnsville-based, regionally-licensed, full-service consumer debt buyer and receivable asset management company that focuses on the acquisition, management, recovery and resale of under and non-performing portfolios of consumer debt."[1]

Both parties moved for summary judgment, but during the course of briefing, the plaintiffs moved to amend their complaint. W&A does not

---

[1] http://weinerman.net/ (last visited 5/12/15).

oppose this motion. W&A suggests that the Court should treat its motion for summary judgment as one for failure to state a claim because the amended complaint is intended to conform the pleadings to the facts of the case. At this point, after the opportunity for discovery, the distinction is mostly semantics, but as the Court views the record, it still must consider matters outside of the pleadings to resolve the pending motions. *See* Fed. R. Civ. P. 12(d). Therefore, the Court will treat the motions as motions for summary judgment.

For the reasons that follow, W&A's motion for summary judgment is granted, and the plaintiffs' motion is denied.

## BACKGROUND

In 1975, Daniel Morgan married Nancy Morgan. Nancy Morgan later remarried and is now known as Nancy McGhee. While they were married, Daniel and Nancy Morgan opened a joint credit card account with U.S. Bank. In 1978, the Morgans were divorced. Daniel Morgan continued using the U.S. Bank credit card after the divorce. In 2008, Mr. Morgan stopped using the card and filed for bankruptcy. Thereafter, Mr. Morgan did not make any further payments on the account.

On April 30, 2010, U.S. Bank sold the Morgan/McGhee account to NLEX, LLC. NLEX then sold the account to MSU Partners, LLC. MSU

Partners placed the McGhee account with W&A for collection. MSU Partners represented that "Nancy Morgan McGhee" was the account holder and that the amount due on the account was $21,789.93. On May 3, 2010, W&A obtained a credit report from Transunion for the purpose of collecting the debt owed by Ms. McGhee on the Morgan/McGhee account.

Since 2008, W&A has used the built-in protections of its collection software to prevent further collection activity on accounts that have been transferred to lawyers or sold to third parties. The software prohibits most employees from even viewing inactive accounts. The McGhee account was properly designated as "inactive" when the account file was taken up by Financial Control Solutions for legal action in May of 2011.

In mid-August 2011, MSU Partners recalled the Morgan/McGhee Account from W&A. Paul Boland, W&A's IT Director, and Jeremy Becker, W&A's Operations Manager at the time, were the only employees of W&A with the ability and authority to reverse the protected, inactive status of accounts. When Boland used the collection software to designate the recalled account files "inactive" and purge them from W&A's collection system, the software did not purge the McGhee account and approximately 13 or 14 other inactive account files. These already-inactive account files could not be purged without first reversing their protected status. This

safeguard assures that an account already under an outside lawyer's control is not taken out of W&A's system: in order to be purged, the account must first be returned by the lawyers to W&A. This safeguard also helps ensure that lawyers are notified of changes in the status of an account, that W&A's system continues to track all accounts subject to legal enforcement, and that no improper action is taken on the account after it is purged.

W&A's records show that, instead of purging the Morgan/McGhee account file, W&A's software generated an error message listing the system account numbers for the McGhee account and other similarly designated accounts, and stating that the person conducting the purge, Mr. Boland, did not have the company security level needed to make changes to those accounts. Boland did not act on the error message. Because Boland did not take corrective action by removing the inactive and legal designation for the accounts, the McGhee account remained in W&A's system, although in inactive status.

During the time that Boland was at W&A, he handled approximately 20 sales of accounts, including the recall of the accounts that included the McGhee account file. The August 2011 episode was the only occasion in which Boland left account files in the system that should

- 4 -

have been purged. In other instances, he took proper corrective action to re-categorize and purge accounts that had inactive legal status.

As a result of its incorrect designation as inactive for legal enforcement rather than outright purged, the McGhee account remained in W&A's system as an inactive account assigned for legal enforcement, and the recall was not shown in the account history of the McGhee account. Additionally, as a result of the incorrect designation, the McGhee account was mistakenly activated on January 17, 2013, after W&A brought numerous accounts back "in house" that had been in legal enforcement status.

On January 18, 2013, the W&A employee assigned the account, Richard Weinerman, called Ms. McGhee, who abruptly referred him to her lawyers and told him never to contact her again. Mr. Weinerman then placed a call to Ms. McGhee's lawyer. Taylor Weber, a receptionist at the law firm, took the call. A transcribed portion of this conversation is reproduced as follows:

 T: Taylor Weber

 S: Sid Cohen[2]

---

[2] The FDCPA does not prohibit the use of aliases. *See Knoll v. Allied Interstate, Inc.*, 502 F. Supp. 2d 943, 946 (D. Minn. 2007). Aliases must be registered under Minnesota law. *See* http://consumerlawyer.mn/debt-collector-complain-of-harassment/ (last visited 5/11/15).

T: Good afternoon, Krekeler Strother.

S: Hi yes, I'm trying to reach Briane Pagel, I was told to give you a call by a less-than-wonderful debtor of yours.

T: OK, and what is your name?

S: Sid Cohen.

…

S: Y'want me to hold?

T: Sure.

S: OK.

…

T: Thank you for holding. She is actually still on her other line, did you want to continue holding, or would you like her voicemail?

S: Is there any way that you could take a personal message for me?

T: Oh, sure, that would be fine.

S: OK, I got a call from Nancy McGhee …

…

S: Alright. She was really nasty to me on the phone though, I just can't believe it. I never spoke to her before.

T: I do apologize for that.

…

S: I just can't believe how nasty she was, it was just, y'know. … that somebody would just be that way, cuz, I mean, it's not like they're deliberately nasty in general.

T: It just wasn't. … Yeah, just like, "I've never talked to you before" …?

S: I've never spoken to her before, and she was like, "Don't you ever call here!!" It's like, I dunno … My God!

T: OK …

S: It's like, really? Really??

…

S: Can you tell me what's going on here then.

T: I can't personally, but you'd have to talk to the attorney about it, so you'd have to talk to Briane about it … um … but like I said, Jen is on the line … If you'd like I can put you through to Briane's voicemail, otherwise, Jen's able to check hers more often than Briane.

S: Oh, uh, if you can just get a message to him and have him call me back, I don't really like doing the voicemails cuz they never get returned.

T: OK, well, I will send him an e-mail then for you, OK?

S: Alright.

…

S: And there's a debt here for $21,789.98.

- 7 -

> T: OK, and where are you calling from?
>
> S: I'm calling from Weinerman and Associates.
>
> T: OK … ok, and I'm sorry, I didn't mean to cut you off – what did you say you needed?
>
> S: What do you mean, what I needed? Well, we need … She has a bill in my office for $21,789.98.
>
> T: Oh, she … OK, OK, so she owes … she owes … she still owes your firm money. OK.
>
> S: Yeah.
>
> T: OK, I will, um, e-mail that to Briane.[3]

McGhee's Brief in Opposition, at 7-9; *see also* Affidavit of Donald Roberts, Ex. A. Weinerman was not aware that the McGhee account had been recalled in 2011 and was, in actuality, no longer with W&A. Weinerman understood the receptionist to acknowledge that he was calling about a debt.

McGhee's attorney, Briane Pagel, returned Weinerman's call the following Monday, January 21, 2013. At the beginning of the call, Weinerman told Pagel who he was and identified the debt, including the original creditor and who he understood to be the current owner of the account, MSU Partners, LLC. Attorney Pagel informed Weinerman that

---

[3] W&A asserts that this transcription of the conversation is inaccurate, but the Court will accept it as true and accurate for purposes of this opinion.

the debt was actually owned by Salander Enterprises, LLC, which had sued McGhee to collect the debt in 2011. Pagel was confident enough about his client's position and consumer protection law to threaten legal action against W&A during the call.

Following this call, W&A reviewed the McGhee account and promptly recognized and acknowledged its mistake in writing to Attorney Pagel. W&A also apologized to the McGhees for its mistake. In 2013, Mr. Boland returned to W&A and audited W&A's system with W&A's Operations Manager, Donald Roberts, to ensure that all instances in which recalled accounts were not purged were corrected.

## ANALYSIS

Summary judgment is appropriate if the record evidence reveals no genuinely disputed material fact for trial and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court views the evidence in a light most favorable to the nonmoving party. *Rosario v. Brawn*, 670 F.3d 816, 820 (7th Cir. 2012). On cross-motions for summary judgment, the Court is "required to adopt a Janus-like perspective, viewing the facts for purposes of each motion through the lens most favorable to the non-moving party." *Moore v. Watson*, 738 F. Supp. 2d 817, 827 (N.D. Ill. 2010). The Court thus "construes all inferences in favor of the party

against whom the motion under consideration is made." *Kort v. Diversified Coll. Servs., Inc.*, 394 F.3d 530, 536 (7th Cir. 2005).

## I.  FDCPA

The purpose of the FDCPA is to protect consumers from abusive, deceptive, and unfair debt collection practices. *See* 15 U.S.C. §§ 1692d, 1692e, 1692f. The statute is intended for the protection of unsophisticated consumers, so "in deciding whether for example a representation made in a dunning letter is misleading the court asks whether a person of modest education and limited commercial savvy would be likely to be deceived." *Evory v. RJM Acquisitions Funding LLC*, 505 F.3d 769, 774 (7th Cir. 2007). However, the Seventh Circuit has held that the "unsophisticated consumer" standpoint is inappropriate for judging communications with lawyers. *Id.* Thus, "a representation by a debt collector that would be unlikely to deceive a competent lawyer, even if he is not a specialist in consumer debt law, should not be actionable." *Id.* at 775.

McGhee alleges that Weinerman's January 18, 2013 phone conversation with Taylor Weber, a receptionist at McGhee's lawyer's former law firm, violates the FDCPA. As an initial matter, McGhee argues that the unsophisticated consumer standard should apply to this communication. McGhee's argument makes little sense given the factual

backdrop of this case. The entire purpose of Weinerman's conversation with Weber was to convey a message to Briane Pagels, McGhee's lawyer, not to McGhee directly. Indeed, McGhee expressly told Weinerman to call Attorney Pagels and to never call her again. Weber may herself be an unsophisticated consumer, but she is not the plaintiff in this case.

McGhee argues that Weinerman's representation to Weber that McGhee owed "his firm" over $20,000 in credit card debt was false, deceptive, or misleading. § 1692e. This is one aspect of the transcript, cited above, that is disputed by W&A. Weinerman and Weber were talking over themselves at the end of their conversation. Weinerman was trying to convey to Weber that he was calling about a debt, and he thought he got his point across with sufficient clarity. Even if Weinerman did misrepresent the ownership of the debt, competent counsel would be (and were) able to verify the ownership of the debt. Indeed, it would seem that even an unsophisticated consumer such as McGhee would not be confused since she was sued over the debt by a separate entity, Salander Enterprises, in 2011. *See Williams v. OSI Educ. Servs.*, 505 F.3d 675, 678 (7th Cir. 2007) ("The unsophisticated consumer … is wise enough to read collection notices with added care, possesses reasonable intelligence, and is capable of making basic logical deductions and inferences"). This is not an

instance, as imagined in *Evory*, where a lawyer "might be unable to discover the falsity of the representation without an investigation that he might be unable, depending on his client's resources, to undertake." 505 F.3d at 775.

McGhee also argues that Weinerman's comments about her being a "nasty," "less-than-wonderful debtor" constitute unlawful harassment or abuse. § 1692d. The primary problem with this claim is that these comments were not directed at McGhee or her attorney. Instead, as discussed at length above, Weinerman was describing McGhee's demeanor to her attorney's receptionist. There is no evidence in the record that these comments were ever passed along to McGhee or to Attorney Pagels, and the only message that Weinerman left for Pagels was that he was calling about a debt. In any event, neither a competent attorney nor an unsophisticated consumer would have felt abused or harassed after hearing those comments. Instead, Weinerman's comments strike a plaintive tone about how he *himself* was being abused by Ms. McGhee. They do not create the "tone of intimidation" proscribed by the statute. *See Jeter v. Credit Bureau, Inc.*, 760 F.2d 1168, 1179 (11th Cir. 1985). For similar reasons, the Court questions whether Weinerman's comments were made "in connection with the collection of a debt." § 1692d; *compare,*

*Horkey v. J.V.D.B. & Assocs., Inc.*, 333 F.3d 769, 774 (7th Cir. 2003) (debt collector's message to "stop being such a [expletive] bitch" was not "offering general advice about how [the debtor] could improve her disposition. He was telling her, crudely but specifically, to be more receptive to his entreaties regarding the debt").

## II.  Bona fide error defense

The FDCPA provides that a debt collector "may not be held liable in any action brought under this subchapter if the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." § 1692k(c). This is the so-called bona fide error defense. To qualify for the defense, W&A must show that the presumed FDCPA violation was not intentional, that the presumed FDCPA violation resulted from a bona fide error, and that it maintained procedures reasonably adapted to avoid any such error. *Kort v. Diversified Coll. Servs., Inc.*, 394 F.3d 530, 537 (7th Cir. 2005). To obtain the defense, a debt collector "need only show that its FDCPA violation was unintentional, not that its actions were unintentional." *Id.*; *see also Nielsen v. Dickerson*, 307 F.3d 623, 641 (7th Cir. 2002) (debt collector "may avail itself of the bona fide error defense because it had no intent to violate the

- 13 -

FDCPA, although its actions were deliberate").

As explained above, the Morgan/McGhee account should have been purged when it was recalled by MSU Partners in 2011. Instead, the account remained in W&A's system until it was activated in 2013. W&A's IT Director, Paul Boland, erred by not acting on the error message that was generated when he attempted to purge the account, the only instance where Boland didn't act on this type of error message. Moreover, W&A did not benefit from the error. Instead, W&A accidentally exposed itself to liability, and W&A immediately apologized to Ms. McGhee upon realizing its error. Therefore, the FDCPA violation was not intentional, the failure to purge the account resulted from a bona fide error, and W&A maintained procedures to avoid the error — i.e., a high-level employee could (and usually did) override an error message to purge an inactive account.

### III. Statute of limitations

McGhee concedes that any FDCPA claims relating to events prior to August 27, 2012 are barred by the one-year limitations period. 15 U.S.C. § 1692k(d).

### IV. WCA

When all federal claims in a suit in federal court are dismissed before trial, the presumption is that the Court will relinquish jurisdiction

- 14 -

over supplemental state-law claims. *Al's Serv. Ctr. v. BP Prods. N. Am., Inc.*, 599 F.3d 720, 727 (7th Cir. 2010). This presumption can be displaced in certain circumstances, including, for example, when it is "absolutely clear how the pendent claims can be decided." *Sharp Elecs. Corp. v. Metro Life Ins. Co.*, 578 F.3d 505, 514-15 (7th Cir. 2009). It is absolutely clear how McGhee's WCA claim that is based on the January 2013 phone calls can be decided because of the bona fide error defense discussed herein. Wis. Stat. § 425.301(3); *First Wis. Nat. Bank v. Nicolaou*, 335 N.W.2d 390, 395 n.12 (Wis. 1983) ("Examples of clerical errors are mistakes in calculations, filing, printing, computer programing, and equipment malfunctions").

As to the remaining claims, McGhee argues that the WCA's limitations period, Wis. Stat. § 425.307(1), stretches back farther than the FDCPA's one-year limitations period. Instead of resolving this issue of state law, the Court will relinquish jurisdiction over the balance of the state law claims. *Khan v. State Oil Co.*, 93 F.3d 1358, 1366 (7th Cir. 1996) (presumption to relinquish jurisdiction is "based on a legitimate and substantial concern with minimizing federal intrusion into areas of purely state law").

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

1. The plaintiffs' motion for summary judgment [ECF No. 35] is **DENIED**;

2. W&A's motion for summary judgment [ECF No. 37] is **GRANTED-IN-PART** and **DENIED-IN-PART**. W&A is entitled to summary judgment on the plaintiffs' federal claims. W&A is also entitled to summary judgment on the plaintiffs' state law claims that are based on W&A's contact with Nancy McGhee in January of 2013. The remaining state law claims are **DISMISSED** for lack of jurisdiction. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 20th day of May, 2015.

BY THE COURT:

*/s/ Rudolph T. Randa*
**HON. RUDOLPH T. RANDA**
**U.S. District Judge**